**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SHARP CORPORATION<br><br>　　and<br><br>SHARP ELECTRONICS CORPORATION,<br><br>　　Plaintiffs,<br><br>　　　　v.<br><br>HISENSE USA CORPORATION<br><br>　　and<br><br>HISENSE INTERNATIONAL (HONG KONG) AMERICA INVESTMENT CO. LTD.,<br><br>　　Defendants. | Civil Action No. 17-1648 (JEB) |

## MEMORANDUM OPINION

Should a federal court stand idly by when a foreign arbitral commission issues an order restricting the speech of a private party?  Actually, yes.  Here, two Asian television manufacturers, Sharp and Hisense, entered into a 2015 licensing agreement under which Hisense would make and market televisions bearing Sharp's name.  In 2017, alleging that Hisense had violated various regulatory standards and failed to maintain the quality of its television sets, Sharp terminated the agreement.  A week later, under a provision of the licensing agreement providing that all disputes would be arbitrated by the Singapore International Arbitration Center, Hisense filed an arbitration action there.  Among other relief, Hisense sought an emergency order requiring that Sharp abide by the agreement while the full arbitration was pending and enjoining

1

it from making disruptive or disparaging statements about Hisense or the licensing dispute.  In May 2017, an emergency arbitrator in Singapore issued an interim award granting that injunctive request.

Sharp thereafter filed suit here and now seeks a preliminary injunction declaring that the interim award is not enforceable in the United States because it contradicts U.S. public policy. Specifically, Sharp argues that the emergency award – which it deems a "gag order" –  would prevent it from communicating with both consumers and the Federal Communications Commission, and is thus against the policies enshrined in the First Amendment of the U.S. Constitution.  Hisense opposes the Motion for a Preliminary Injunction and has moved to dismiss the case, asserting that this Court lacks both subject-matter and personal jurisdiction, and that the award does not violate our public policy.  Although subject-matter jurisdiction exists here, personal jurisdiction does not; in any event, the interim award does not contradict any fundamental public policy that would allow Sharp to prevail.  The Court will therefore dismiss the Complaint in its entirety.

## I.    Background

Given the Court's ruling here, it must consider the facts as set forth in the Complaint. The relationship between Sharp and Hisense started on amicable terms.  In July 2015, Sharp, a Japanese electronics company, entered into a limited trademark-licensing agreement (TLA) with Hisense, a Chinese manufacturer.  See ECF 1 (Complaint), ¶ 24.  The TLA allows Hisense to "manufacture, assemble, promote, market, distribute, [and] sell" Sharp-branded televisions.  See ECF No. 28-2 (Licensing Agreement), ¶ 2.1.  It also provides that "[a]ny disputes arising out of or in connection with this Agreement, including any question regarding its validity or termination, shall be referred to and finally resolved in Singapore by Singapore International

Arbitration Centre in accordance with the Arbitration Rules of [the Centre,] . . . which rules are deemed to be incorporated by reference."  TLA, ¶ 28.1.

According to Sharp, "immediately" after entering into the TLA, Hisense began to fall short of its contractual obligations.  See Mot. for PI at 2.  It allegedly "fail[ed] to comply with regulations and maintain the required standards and quality of its television sets."  Id.  Based on these violations, Sharp terminated the TLA on April 17, 2017.  Id. at 3.  On April 24, Hisense filed for arbitration in Singapore with the SIAC, seeking emergency relief to reinstate the TLA.  Id.  On May 9, an arbitrator appointed to consider the emergency motion issued a 33-page "emergency" interim award.  See ECF No. 8-3 (Emergency Award).  The interim award prohibited Sharp from terminating the TLA, required it to continue to perform under the agreement while the arbitration was pending, and imposed an order stating:

> [Sharp] shall refrain from, directly or indirectly through its affiliates, disparaging [Hisense] and/or disrupting its business, including by making public statements or press releases about this arbitration and/or the dispute between [Hisense] and [Sharp], or approaching [Hisense's] business associates and/or other third parties (including, but not limited to, [Hisense's] customers, suppliers, content and service providers, and/or regulatory authorities, except as required by law), in respect of any matters that are to be addressed in arbitration under the [License Agreement].

Emergency Award, ¶ 135 (iii).  It is this portion of the award, which Sharp characterizes as a "one-sided Gag Order," Mot. for PI at 3, that Plaintiffs now contest.

On August 15, 2017, Plaintiffs Sharp Corporation and Sharp Electronics Corporation filed a Complaint in this Court, alleging that the emergency order "is contrary to the public policy of the United States embodied in the First Amendment of the Constitution, including (1) the public policy that prohibits a prior restraint on speech absent extraordinary circumstances, and (2) the public policy that favors the right to petition the Government."  Compl., ¶ 5.  Sharp

requested declaratory and injunctive relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, seeking an "order declaring that the Gag Order against Sharp is not recognizable or enforceable in the United States" and "enjoin[ing] Hisense from taking any action to enforce the Gag Order in the United States." Id., ¶¶ 2,5. The same day they submitted their Complaint, Plaintiffs also filed a Motion for Preliminary Injunction, asking the Court to enjoin the enforcement of the "gag order" and declare that it is "contrary to the public policy of the United States and is thus unenforceable." Mot. for PI at 2.

In response, Defendants Hisense USA Corporation and Hisense International filed an Opposition to Plaintiffs' Motion for Preliminary Injunction, see ECF No. 22, as well as a Motion to Dismiss, or, alternatively, stay the action. See ECF No. 21. On October 27, this Court heard oral argument on the Motions and now issues this expedited Opinion.

## II.    Legal Standard

Because the Court grants Hisense's Motion to Dismiss, it need not address the standards governing a preliminary injunction and will instead consider this case under Rules 12(b)(6), 12(b)(1), and 12(b)(2).

In evaluating Defendants' Motion to Dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C.

Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)).

To survive a motion to dismiss under Rule 12(b)(1), conversely, Plaintiffs bear the burden of proving that the Court has subject-matter jurisdiction to hear their claims.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Id. at 13–14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)).  Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens Pharm., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Finally, under Rule 12(b)(2) a defendant may move to dismiss a suit if the court lacks personal jurisdiction over him.  Personal jurisdiction determines the court's "authority over the parties . . . , so that the court's decision will bind them."  Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 577 (1999).  The plaintiff bears the burden of establishing that such jurisdiction exists. See FC Inv. Grp. LC v. IFX Markets, Ltd., 529 F.3d 1087, 1091 (D.C. Cir. 2008).  In deciding whether the plaintiff has shown a factual basis for personal jurisdiction over a defendant, the court resolves factual discrepancies in favor of the plaintiff.  See Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990).  When personal jurisdiction is challenged, "the

district judge has considerable procedural leeway in choosing a methodology for deciding the motion." 5B Charles A. Wright & Arthur R. Miller *et al.*, Federal Practice and Procedure § 1351 (3d ed. 2004). The Court may rest on the allegations in the pleadings, collect affidavits and other evidence, or even hold a hearing. Id.

## III. Analysis

As it must address jurisdictional concerns first, the Court begins with Defendants' assertion that the Court does not have subject-matter jurisdiction over this case. It moves next to Hisense's arguments on personal jurisdiction and concludes with an analysis of the merits of Plaintiffs' suit.

### A. Subject-Matter Jurisdiction

Hisense first argues that the New York Convention, which governs the enforcement of international arbitration awards, does not give the Court jurisdiction to grant the remedy Sharp seeks. Plaintiffs, of course, see things differently. They assert that the strictures of the Convention do not preclude the Court from providing the requested declaratory relief. In analyzing the issue, the Court starts with the Convention and then considers the Declaratory Judgment Act.

#### 1. *New York Convention*

The enforcement of foreign arbitral awards falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, better known as the "New York Convention," 1958, 21 U.S.T. 2517, T.I.A.S. No. 6997, 330 U.N.T.S. 38. The Convention controls "the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought." Chevron Corp. v. Republic of Ecuador, 949 F. Supp. 2d 57, 62 (D.D.C. 2013), aff'd sub nom. Chevron Corp. v.

Ecuador, 795 F.3d 200 (D.C. Cir. 2015).  In the United States, the New York Convention has

been codified in Chapter 2 of the Federal Arbitration Act.  See 9 U.S.C. §§ 201–08.  Together,

the Convention and its implementing legislation "encourage the recognition and enforcement of

commercial arbitration agreements in international contracts."  TermoRio S.A. E.S.P. v.

Electranta S.P., 487 F.3d 928, 933 (D.C. Cir. 2007) (citation omitted).

Pursuant to the FAA, United States district courts have original jurisdiction over an

"action or proceeding falling under the Convention."  9 U.S.C. § 203.  The scope of that

jurisdiction, however, is governed by the terms of the Convention, which distinguishes between

"primary" and "secondary" courts.  TermRio, 487 F.3d at 935 (citation omitted).  The former are

those courts of the country in which, or under the law of which, an award is rendered.  The latter

are those courts of all other signatory countries.  The distinction between these two categories

determines the jurisdictional and remedial authority of a given court.  Under the Convention,

primary-jurisdiction courts have the exclusive authority to affirmatively set aside or annul an

arbitration award, while secondary-jurisdiction courts have a more limited authority to review

and decide whether to enforce such an award.  Id., 487 F.3d at 935; Gulf Petro Trading Co., Inc.

v. Nigerian Nat'l Petroleum Corp., 512 F.3d 742, 747 (5th Cir. 2008) (holding that "a United

States court sitting in secondary jurisdiction lacks subject matter jurisdiction over claims seeking

to vacate, set aside, or modify a foreign arbitral award" and "may only refuse or stay

enforcement of an award"); Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas

Bumi Negara, 364 F.3d 274, 287 (5th Cir. 2004) (noting that in courts of secondary jurisdictions

"parties can only contest whether that state should enforce the arbitral award"); M & C Corp. v.

Erwin Behr GmbH & Co., KG, 87 F.3d 844, 848 (6th Cir. 1996) (holding that plaintiff "may not

seek to vacate the arbitral award in the district court" of a secondary jurisdiction).

In this case, both parties agree that this Court, unlike Singapore, is a secondary jurisdiction. Defendants, consequently, maintain that Plaintiffs' suit falls outside of the authority of secondary-jurisdiction courts because it ultimately seeks to "void, annul, or modify" the arbitral award. See Hisense Reply at 3. Yet Sharp seeks no such broad relief. Rather, it has requested only that this Court declare the gag order unenforceable in the United States, a permissible goal in a secondary jurisdiction. See Compl., ¶ 6

This limited remedial request distinguishes this case from those relied upon by Hisense, in which plaintiffs sought, at least in part, to vacate the underlying award *in toto*. In Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust, 863 F. Supp. 2d 351 (S.D.N.Y. 2012), for example, the plaintiff sought a declaration that the arbitration decision was "void and unenforceable," a remedy that the court held would "essentially accomplish" the goal of vacating the award. Id. at 356. Similarly, in Stedman v. Great Am. Ins, Co., 2007 U.S. Dist. LEXIS 25973 (D.N.D. Apr. 3, 2007), the court faced a motion asking for the functional equivalent of vacatur. Plaintiffs there initially brought a motion to vacate, amend, or correct the arbitration award, which they later recharacterized as a motion to "confirm [the award] to the extent confirmable." Id. at *11. The court concluded that it lacked subject-matter jurisdiction over this motion, as Plaintiffs still sought to "vacate" the portions of the award that were "indefinite or ambiguous" or "beyond the arbitrator's authority." Id. at *11-12. Finally, Defendants' citation to Gemini Consulting Group v. Horan Keogan Ryan, 2007 U.S. Dist. LEXIS 39509 (N.D. Ill. May 30, 2007), is unavailing, as the plaintiff there sought "a declaration that the Awards issued by the arbitrator are invalid and not enforceable against Gemini." Id. at *12 (emphasis added). The court in that case noted that entering such an order "would be akin to setting aside or vacating the awards," and it therefore found that it lacked the requisite jurisdiction. Id.

Once again, Sharp does not seek such a drastic remedy here.  Granting the motion for a declaratory judgment would not "set aside" or "vacate" the underlying award.  Instead, it would determine only whether the emergency order is enforceable in the United States, <u>see</u> Compl. at 2, not whether it is valid worldwide.  Such a determination clearly falls within the purview of secondary-jurisdiction courts.

The Court's conclusion that Plaintiffs are not seeking to vacate the arbitration award also resolves Defendants' alternative contention that Sharp's suit is untimely.  Although the New York Convention does not contain a statute of limitations for petitions to vacate arbitration awards, the FAA, which supplements the Convention, requires that such actions be filed within three months after the award is filed or delivered.  <u>See</u> 9 U.S.C. § 12.  Hisense asserts that Sharp is, in fact, suing to vacate the emergency award, and that Plaintiffs' action is untimely because it was filed one week after the three-month period expired.  <u>See</u> Hisense Reply at 12-13.  As the Court concludes that Sharp is seeking only to have the emergency order declared unenforceable in the United States – and the FAA contains a three-year statute of limitations for such enforcement actions – its suit is therefore timely.  <u>See</u> 9 U.S.C. § 207.

## 2.  *Declaratory Judgment Act*

Determining that Plaintiffs are not seeking to vacate the arbitration award, however, does not fully resolve the jurisdictional inquiry.  This is because Sharp's suit comes before the Court in a somewhat unusual posture – a motion for a declaratory judgment that the emergency order is unenforceable.  As Defendants note, the New York Convention discusses the power of a court in a secondary jurisdiction over actions to <u>enforce</u> arbitration awards and the ability of defendants to raise certain affirmative defenses in such enforcement proceedings.  The Convention does not, however, expressly address suits in which a party preemptively seeks to have an award declared

unenforceable, as is the case here. Hisense argues that this distinction matters, and that the Court therefore lacks jurisdiction over Sharp's "proactive" action. See MTD at 12. Yet this assertion ignores Plaintiffs' chosen vehicle for bringing this suit – the Declaratory Judgment Act.

It has long been clear that the Act is not a jurisdiction-conferring statute. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950); C & E Servs., Inc. of Washington v. D.C. Water & Sewer Auth., 310 F.3d 197, 201 (D.C. Cir. 2002) ("[T]he Declaratory Judgment Act 'is not an independent source of federal jurisdiction.'") (citation omitted). Rather, a party seeking declaratory relief must "have valid grounds for federal jurisdiction independent of the Act." Comm. on Oversight & Gov't Reform v. Holder, 979 F. Supp. 2d 1, 22 (D.D.C. 2013). In determining whether such a basis for jurisdiction exists, federal courts look to "the nature of the threatened action in the absence of the declaratory judgment suit." Medtronic, Inc. v. Mirowski Family Ventures, LLC, 134 S. Ct. 843, 848 (2014). Put otherwise, they "ask whether a coercive action brought by the declaratory judgment defendant would necessarily present a federal question" or otherwise give rise to federal jurisdiction. Id. If the anticipated suit by a defendant would give rise to federal jurisdiction, there is also such jurisdiction over the action for a declaratory judgment. Id.; see also Comm. on Judiciary, U.S. House of Representatives v. Miers, 558 F. Supp. 2d 53, 83 n.21 (D.D.C. 2008) (citing Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 19 (1983), for proposition that federal courts have jurisdiction over declaratory-judgment suits in which "if the declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question"); Wisconsin v. Ho–Chunk Nation, 512 F.3d 921, 935 (7th Cir. 2008) (stating that jurisdiction under Act is "determined by whether federal question jurisdiction would exist over the presumed suit by the declaratory judgment defendant"). It is irrelevant for the purposes of the Declaratory Judgment

Act that "the parties are transposed," Surefoot LC v. Sure Foot Corp., 531 F.3d 1236, 1245 (10th Cir. 2008), as it is "the nature of the controversy, not the method of its presentation or the particular party who presents it, that is determinative." Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 244 (1937).

To determine whether it has jurisdiction over Plaintiffs' declaratory-judgment action, then, the Court must imagine the anticipated suit Sharp seeks to avoid by requesting such relief. Here, Plaintiffs are asking for a declaration that the interim relief issued by the emergency arbitrator – the so-called "gag order" – is unenforceable in the United States. Presumably, the suit Sharp wishes to disable is an action by Defendants to enforce the emergency order in U.S. courts. The question is thus whether this Court would have subject-matter jurisdiction over that "hypothetical threatened action." Medtronic, 134 S. Ct. at 849.

It requires no gift of premonition to see that the answer is yes. The implementing provisions of the FAA state that, when a court has primary or secondary jurisdiction under the New York Convention, "[a]n action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States." 9 U.S.C. § 203. As discussed above, this Court would clearly have secondary jurisdiction over an enforcement action by Hisense in U.S. courts. The Court, accordingly, has federal-question jurisdiction over this corollary action for a declaratory judgment. Indeed, in a remarkably similar case, Hospira, Inc. v. Therabel Pharma N.V., 2013 WL 381148 (N.D. Ill. July 19, 2013), the plaintiff sought a "declaration . . . pursuant to the Declaratory Judgment Act . . . that it ha[d] no agreement to arbitrate with" Defendant. Id. at *1. The court in Hospira addressed the interaction between the Declaratory Judgment Act and the New York Convention, noting that the plaintiff's complaint "anticipates a suit by [Defendant] . . . to compel [Plaintiff] into arbitration before the ICC." Id. at *7. Finding

that it would have jurisdiction over such "anticipated claims," the court concluded that it had subject-matter jurisdiction over the action for a declaratory judgment. Id. at *8. The facts of this case nearly mirror those in Hospira. Plaintiffs are asking for a declaratory judgement in anticipation of an enforcement claim by Defendants under the New York Convention. As this Court would have jurisdiction over such a case pursuant to the FAA and the Convention, it thus has federal-question jurisdiction over the instant suit.

Finally, the Court at oral argument independently raised the issue of whether a particular SIAC rule precludes Sharp's challenge to the emergency interim award. SIAC Schedule 1, Rule 12 states that an emergency award "shall be binding on the parties from the date it is made" and that the parties "irrevocably waive their rights to any form of appeal, review or recourse to any State court or other judicial authority with respect to such Award insofar as such waiver may be validly made." SIAC Rules, http://www.siac.org.sg/our-rules/rules/siac-rules-2016. Although the text of this rule would appear to preclude Plaintiffs' suit contesting the scope of the emergency award, Defendants did not raise this issue in their papers. The Court will therefore consider this argument forfeited and need not determine the effect of the SIAC rules on Sharp's ability to file the instant suit.

B.  Personal Jurisdiction

The Court turns next to Defendants' position that Sharp has not demonstrated personal jurisdiction in the District over Hisense International and Hisense USA. See MTD at 13-16.

1.  *Legal Framework*

Personal jurisdiction may take the form of general or specific jurisdiction. The former exists where a non-resident defendant maintains sufficiently systematic and continuous contacts with the forum state, regardless of whether those contacts gave rise to the claim in the particular

suit.  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414–15 (1984).

General jurisdiction is permitted based on "only a limited set of affiliations with a forum," all of

which are tantamount to Defendant's domicile.  See Daimler AG v. Bauman, 134 S. Ct. 746, 760

(2014).  For corporations, general jurisdiction may be asserted if the forum is one in which the

corporation is "fairly regarded as at home," which has been defined as generally being either its

"place of incorporation" or its "principal place of business."  Id. (quoting Goodyear Dunlop Tires

Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011)).  Here, Defendants are both multi-national

corporations: Hisense International is incorporated and has its principal place of business in

China, and Hisense USA is similarly connected to Georgia.  See Compl., ¶¶ 9-10.  Because

neither Defendant is functionally "at home" in the District, general jurisdiction does not apply.

This leaves the possibility of specific jurisdiction.  "In contrast to general, all-purpose

jurisdiction, specific jurisdiction is confined to adjudication of issues deriving from, or connected

with, the very controversy that establishes jurisdiction."  Goodyear Dunlop Tires, 564 U.S. at

919 (citation omitted).  In other words, specific jurisdiction exists where a claim arises out of the

non-resident defendant's contacts with the forum.  See Helicopteros, 466 U.S. at 414 n.8; United

States v. Ferrara, 54 F.3d 825, 828 (D.C. Cir. 1995).  "A plaintiff seeking to establish specific

jurisdiction over a non-resident defendant must establish that specific jurisdiction comports with

the forum's long-arm statute and does not violate due process."  FC Inv. Grp., 529 F.3d at 1094-

95 (internal citation omitted).  In relevant part, the District of Columbia's long-arm statute reads,

"A District of Columbia court may exercise personal jurisdiction over a person, who acts directly

or by an agent, as to a claim for relief arising from the person's . . . transacting any business in

the District of Columbia."  D.C. Code § 13–423(a)(1).  The question, therefore, is whether

Sharp's claims "arise out of or relate to" Hisense's conduct in this city.  See Bristol-Myers

Squibb Co. v. Superior Court, 137 S. Ct. 1773, 1786 (2017) (quoting Helicopteros, 466 U.S. at 414).

        2.   *Sufficient Contacts*

In denying such connections, Defendants assert that "the alleged sale of televisions [in the District] is not sufficiently related to Plaintiffs' attempt to challenge a foreign arbitration award as violating their rights to free speech." Reply at 9. Rather, Hisense's perspective is that "[t]he entire controversy" giving rise to Sharp's Complaint "focuses solely on the validity of the arbitration proceeding, the Emergency Order, and Plaintiff's free-speech rights," none of which has any "causal nexus" with the District. See MTD at 15. Plaintiffs retort that "[t]his action directly arises from Hisense's activities directed at and occurring in the District." Sharp Resp. at 16. Sharp asserts that "Hisense sells the [Sharp-branded] televisions at issue in physical retail stores throughout the District of Columbia," and that this commercial activity is sufficiently related to the Licensing Agreement so as to give rise to personal jurisdiction. Id. at 17-18. Because the televisions "are on retail shelves in the District of Columbia and expressly assert compliance with FCC standards," Plaintiffs contend that these "contacts form one of the core bases for [their] attempt to declare the Gag Order unenforceable." Id. at 19.

Although it is a close call, the Court finds that Sharp is unable to show that Hisense's contacts with the District have the requisite nexus to the instant suit. This inquiry is fact intensive, focusing on "the relationship among the defendant, the forum, and the litigation." Shaffer v. Heitner, 433 U.S. 186, 204 (1977). This litigation arises out of Plaintiffs' claim that they want to speak, but that they are prevented from doing so by virtue of the interim gag order. In particular, Sharp asserts that, but for the order, it would communicate with consumers

regarding the quality (or alleged lack thereof) of Hisense-made televisions and with the FCC regarding emissions testing of such products.

There is some surface appeal to Sharp's assertion that the relatedness inquiry is satisfied because it seeks relief, in part, to communicate with regulators and consumers about the television sets being sold in the District. Yet Sharp's Complaint is not really about Hisense's sale of televisions here; rather, Plaintiffs' grievances are grounded in the emergency order itself, which has no connection to the forum. FC Inv. Grp. LC v. IFX Mkts., Ltd., 479 F. Supp. 2d 30, 39 (D.D.C. 2007), aff'd, 529 F.3d 1087 (D.C. Cir. 2008) ("plaintiff's jurisdictional allegations must arise from the same conduct of which it complains"); Novak–Canzeri v. Saud, 864 F. Supp. 203, 206–207 (D.D.C. 1994) (explaining that "[t]he claim itself must have arisen from the business transacted in the District or there is no jurisdiction" and finding no jurisdictional nexus between the plaintiff's underlying breach-of-contract claim where "there is no statement that the jurisdictional allegations set forth there necessarily relate to the same activity as the breach of contract allegations"). At bottom, this dispute is principally about an order entered in Singapore, by a foreign arbitrator, regarding a contract signed between two foreign parties. The Court therefore concludes that the nexus between Sharp's claims and Defendants' contacts with the District is too attenuated to support personal jurisdiction.

### 3. *Government-Contacts Doctrine*

Sharp is not yet ready to cede the field, and it offers two other theories to support personal jurisdiction. It first argues that Hisense is subject to specific personal jurisdiction in the District because the company has made repeated filings with the FCC, which is headquartered here. Yet such interactions with the Commission do not, by themselves, confer personal jurisdiction. Under the "government contacts" doctrine, a nonresident who files with a

government agency in the District does not thereby subject itself to personal jurisdiction here.

See Envl. Research Int'l, Inc. v. Lockwood Greene, Inc., 355 A.2d 808, 813 (D.C. 1976).

Plaintiffs nonetheless invoke a narrow exception to this doctrine, which instructs that personal-jurisdiction requirements may be satisfied when a defendant's contacts with a government agency "fraudulently induced unwarranted government action against the plaintiff." Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp., 35 A.3d 1127, 1133 (D.C. 2012). Attempting to frame the facts of this case as falling within this exception, Plaintiffs assert that they are seeking to correct potentially inaccurate filings made by Hisense to the FCC. See ECF No. 33-6 (Declaration of Ian Volner), ¶ 8 (stating that "Sharp wishes to submit to FCC emission test results about Hisense-made Sharp TVs that contradict test results Hisense has already submitted to FCC").

Such positon notwithstanding, Sharp cannot satisfy two crucial components of the Companhia exception: it failed to allege "fraud" on the part of Defendants, and it did not plausibly allege that Hisense's filings induced adverse government action. See Companhia, 35 A.3d at 1134. As to the former, Companhia is clear that the fraud exception to the government-contacts doctrine should be narrowly applied. This restriction is "addressed in part by strict adherence to the standards of pleading." Id. To that end, Companhia states that, in order for the exception to apply, "[i]t will not be sufficient to allege that the [defendant] presented an unbalanced view of the issue or even that he made a false statement," but instead that "[t]he plaintiff seeking to overcome the government contracts doctrine must allege 'fraud.'" Id. Here, Sharp's Complaint contains no such allegations that Hisense filed fraudulent government petitions, much less any actual counts of fraud. See Compl. at 11-13. As Sharp's claims do not "meet the requirements for pleading fraud under Super. Ct. Civ. R. 9(b) or its federal

counterpart," they are not "sufficient to confer personal jurisdiction in the District." Companhia, 35 A.3d at 1135.

Even if Sharp's allegations did rise to such a level, the Complaint nonetheless does not satisfy the second condition under Companhia, which requires that "[t]he plaintiff must also allege that the agency actually relied on the fraudulent information in making its decision," and that the fraudulent information thus "induced unwarranted government action against the plaintiff." Id. at 1134-35; see Morgan v. Richmond Sch. of Health and Tech., Inc., 857 F. Supp. 2d 104, 109 (D.D.C. 2012) (holding fraud exception to government-contacts doctrine inapplicable where no allegations that government agency took any actions against plaintiff); Shaheen v. Smith, 994 F. Supp. 2d 77, 86 (D.D.C. 2013) (holding narrow fraud exception inapplicable because government agency – the SEC – did not take any action against plaintiff as result of defendants' actions). Here, Sharp's assertion of government action is based on the indirect effects of Hisense's allegedly deficient agency filings. More specifically, Plaintiffs' theory of adverse government action is that, by making false representations to the FCC, Hisense induced the agency to continue to allow Hinsese-made, Sharp-branded televisions to be sold with FCC-compliance labels. The ongoing sale of these televisions, Plaintiffs argue, has in turn resulted in economic and reputational harm to Sharp and its brand.

This construction of adverse government action stretches the requirement that "the [fraudulent] petition must provoke government action against the plaintiff" beyond its reasonable bounds. See Globe Metallurgical, Inc. v. Rima Indus. S.A., 177 F. Supp. 3d 317, 326 (D.D.C. 2016) (emphasis added); App Dynamic ehf v. Vignisson, 87 F. Supp. 3d 322, 328 (D.D.C. 2015) (noting that in defining the fraud exception, "the D.C.C.A. emphasized the provoking of government action against another; it did not premise jurisdiction on the mere filing of a

fraudulent petition"). Under Sharp's reading, any government action that affects a plaintiff's business would suffice as "unwarranted government action against the plaintiff." Given the command that the fraud exception be narrowly applied, the Court finds that such a reading would impermissibly extend the holding of Companhia. See Globe Metallurgical, 117 F. Supp 3d at 327-28 (finding that government decision that favors one competitor "cannot be fairly characterized as an action 'against' another, despite the fact that the indirect effect will be to benefit one competitor at the theoretical expense of others" and rejecting reliance on the "indirect impact of an agency decision"). The Court therefore concludes that Hisense's communications with the FCC do not fall within the fraud exception to the general government-contacts doctrine and thus cannot confer personal jurisdiction.

### 4. *State-Owned Entities*

In a final attempt to persuade the Court of its jurisdiction over Defendants, Sharp asserts that Hisense Intl. and Hisense USA, as Chinese state-owned entities, are not persons capable of asserting personal-jurisdiction defenses under the Fifth Amendment. See Omnibus Response at 20-21. As Defendants correctly rejoin, this argument is contrary to both governing precedent and the facts of this case.

Under this Circuit's law, "foreign states are not 'persons' protected by the Fifth Amendment," and they are thus not afforded the jurisdictional protections of that provision. See Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 96 (D.C. Cir. 2002). Yet the same conclusion does not automatically apply to foreign corporations. As this Circuit explicitly held in GSS Group Ltd v. National Port Authority, 680 F.3d 805 (D.C. Cir. 2012), the "same logic" that results in "put[ting] foreign sovereigns in a separate constitutional category from 'private entities'" does not "appl[y] to foreign state-owned corporations." Id. at 813. Rather,

this Circuit has held that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." Id. (internal quotation mark omitted). That presumption is overcome only when "a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them." Id. at 815 "On the other hand, if an instrumentality does not act as an agent of the state, and separate treatment would not result in manifest injustice, the instrumentality will enjoy all the due process protections available to private corporations." Id. (citation omitted). Put another way, "the extent of a state-owned corporation's juridical independence plays a dispositive role in the constitutional analysis." Id.

Here, Plaintiffs have not met their burden of showing that the Chinese government exercises such extensive control over Defendants as to form a principal-agent relationship. Indeed, Sharp ignores a simple, insurmountable stumbling block to its foreign-state theory – *viz.*, Hisense Co., Ltd., the Chinese-owned company, is not a named party in this suit. The two named Defendants, Hisense Intl. and Hisense USA, are both subsidiaries of Hisense Co., Ltd., and Sharp does not allege that these subsidiaries act as "agents" of the Chinese state. Indeed, precedent shows that the foreign-government status of a parent company is not automatically imputed to its subsidiaries. See Dole Food Co. v. Patrickson, 538 U.S. 468, 473 (2003) (holding that "a subsidiary of an instrumentality is not itself entitled to instrumentality status").

Sharp has nonetheless just submitted a recent district court order from the Central District of California, which concluded that Hisense Co., Ltd. is an "instrumentality of a foreign state" for the purposes of the Foreign Sovereign Immunities Act. See ECF No. 42 (October 18, 2017, Order from Case No. 17-3341 (C.D. Cal.)). Yet that determination has little relevance to this case.

First, as discussed above, Hisense Co., Ltd. is not a party to this suit. The California court order in fact supports Defendants' argument that, regardless of the status of Hisense Co., Ltd., the two subsidiaries in this case are not agents of a foreign state. In the California case, Sharp initially filed an action in state court, and Hisense Co., Ltd. removed the entire action to federal district court under the FSIA. In order to show federal jurisdiction under the FSIA, Hisense Co., Ltd. asserted that it was an "agency or instrumentality of a foreign state," as it is directly and wholly owned by a political subdivision of the Chinese government. See C.D. Cal. Order at 3. Yet, although Hisense USA and Hisense Intl. were named defendants in the California state action, they did not join the notice of removal, and Hisense Co., Ltd. did not assert that its subsidiaries were also agencies or instrumentalities of the Chinese state. Indeed, as the California order noted, "[O]nly direct ownership of a majority of shares by the foreign state satisfies the statutory requirement under the FSIA." Id. (internal quotation marks omitted)

Second, the California order addressed the standard governing whether an entity is an "instrumentality" of a foreign government under the FSIA, which is distinct from the determination of that entity's due-process protections under the Fifth Amendment. See GSS Grp. Ltd 680 F.3d at 811, 814 (discussing distinctions between FSIA jurisdiction and Fifth Amendment protections). The conclusion that Hisense Co., Ltd. is an "instrumentality" of the Chinese government for the purposes of the FSIA, therefore, does not compel the conclusion that the corporation is unable to assert a personal-jurisdiction defense, much less that its subsidiaries have no such protections. Id. Because Sharp cannot show that the Defendants in this case – Hisense Intl. and Hisense USA – are under the "plenary control" of the Chinese government, see TMR Energy, 411 F.3d at 301, the Court finds that these corporations are able to contest personal jurisdiction.

*       *       *

In sum, the Court rejects all of Sharp's theories of personal jurisdiction here. While their arguments are creative, Plaintiffs can show neither adequate government contacts by Defendants, nor a bar as foreign entities. As the question of whether Hisense's contacts with the District give rise to specific personal jurisdiction is sufficiently close, however, the Court will, out of an abundance of caution, proceed to address the merits of the case.

C.      Merits

In a nutshell, Sharp contends that the emergency order issued by the SIAC arbitrator is unenforceable because it violates a fundamental U.S. public policy: freedom of speech and the right to petition the government as enshrined in the First Amendment. Hisense responds that such an argument omits a critical component of a viable First Amendment claim – namely, the existence of state action. The question before the Court is thus whether this case does, in fact, involve state action, and, if not, whether Sharp nonetheless may assert a claim that the emergency order offends U.S. public policy.

1.      *Legal Background*

"[A] secondary jurisdiction court must enforce an arbitration award unless it finds one of the grounds for refusal or deferral of recognition or enforcement specified in the Convention." Karaha Bodas, 364 F.3d at 288 (citing 9 U.S.C. § 207). Article V provides the enumerated, exclusive grounds upon which a secondary jurisdiction may decline to enforce or recognize an arbitral award. In relevant part, the Article provides for seven defenses that a party may raise against enforcement. See Convention, Art. V (enumerating seven circumstances where "[r]ecognition and enforcement of the award may be refused" by "the competent authority where the recognition or enforcement is sought"). The party opposing confirmation has the burden of

establishing one of these defenses, as there is a strong presumption in favor of enforcing arbitration awards. See Polimaster Ltd. v. RAE Sys., Inc., 623 F.3d 832, 836 (9th Cir. 2010) ("[Respondent] has the burden of showing the existence of a New York Convention defense. [Respondent's] burden is substantial because the public policy in favor of international arbitration is strong.") (citation omitted). In this case, Sharp relies on the provision of Article V providing that a court may decline to enforce an award when it would be contrary to the public policy of the signatory state. See Convention, Art. V(2)(b).

"Although this defense is frequently raised, it has rarely been successful." Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Cubic Def. Systems, Inc., 665 F.3d 1091, 1097 (9th Cir. 2011) (quotation omitted). Courts have cautioned that the public-policy defense "is to be construed narrowly to be applied only where enforcement would violate the forum state's most basic notions of morality and justice." TermoRio, 487 F.3d at 938 (quoting Karaha Bodas, 364 F.3d 274 at 305-306). Overcoming the presumption in favor of enforcement requires the moving party to "demonstrate a countervailing public policy sufficient to overcome [the] strong policy favoring confirmation." Armed Forces of the Islamic Republic of Iran, 665 F.3d at 1098. This public policy "must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." United Bhd. Of Carpenters and Joiners of America, AFL–CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can., AFL–CIO, 721 F.3d 678, 697 (D.C. Cir. 2013) (quotation omitted). Because this standard is so high, this Circuit has noted that "[o]nly in clear-cut cases ought it to avail defendant." TermoRio, 487 F.3d at 938.

2. *State-Action Doctrine*

Sharp believes it can meet this high bar by relying on the public policy of free speech enshrined in the First Amendment. More specifically, Plaintiffs assert that the emergency order violates the First Amendment's "well defined and dominant" public policy against "one-sided gag orders" and restrictions on a party's ability to petition the government. In relying on the First Amendment, however, Sharp runs into a significant obstacle – the principle that without governmental action, there can be no First Amendment violation. According to Hisense, as this suit presents no such state action, Sharp is out of luck. In response, Sharp first argues that there <u>is</u> in fact governmental action in this case – in the form of the Court's enforcement or nonenforcement of the arbitration award. Unfortunately for Plaintiffs, that theory holds no water.

It is axiomatic that to elicit First Amendment protection, the infringement upon speech or petition rights must have "arisen from state action of some kind." <u>Banner v. Duggan</u> 249 F. Supp. 3d 27, 41 (D.D.C. 2017). As another district court noted last year, there is simply "no authority holding that judicial enforcement . . . of an arbitration award[] constitutes state action." <u>Roberts v. AT&T Mobility LLC</u>, 2016 WL 1660049, at *34 (N.D. Cal. Apr. 27, 2016). The caselaw, in fact, shows ample support for the contrary proposition.

In <u>Davis v. Prudential Securities, Inc.</u>, 59 F.3d 1186 (11th Cir. 1995), for example, the Eleventh Circuit considered the argument that a district court's confirmation of an arbitration award provided the requisite state action for a constitutional claim. The defendant in <u>Davis</u> argued that a punitive-damages award violated its due-process rights, and that the court's participation in enforcing the award was tantamount to governmental action. <u>Id.</u> at 1191. The Eleventh Circuit squarely rejected that reasoning, stating that "the mere confirmation of a private

arbitration award by a district court is insufficient state action to trigger the application of the due process clause." Id. at 1192. This reasoning has been echoed by multiple other courts. See Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc., 191 F.3d 198, 207 (2d Cir. 1999) (holding "no state action in the application or enforcement of [an] arbitration clause"); Federal Deposit Ins. Corp. v. Air Florida Sys., Inc., 822 F.2d 833, 842 n.9 (9th Cir. 1987) ("The arbitration involved here was private, not state, action; it was conducted pursuant to contract by a private arbitrator. Although Congress, in the exercise of its commerce power, has provided for some governmental regulation of private arbitration agreements, we do not find in private arbitration proceedings the state action requisite for a constitutional due process claim."); United Egg Producers v. Standard Brands, Inc., 44 F.3d 940, 943 (11th Cir. 1995) (holding that there is no state action for constitutional purposes where "a court acts to enforce the right of a private party which is permitted but not compelled by law").

Plaintiffs are correct that, in one limited instance, the Supreme Court has found that court enforcement of an agreement between private parties can be considered governmental action. In Shelley v. Kraemer, 334 U.S. 1 (1948), it held that the state court's enforcement of racially restrictive covenants was sufficient state action to invoke the Fourteenth Amendment. Id. at 19. Yet Sharp ignores the fact that the holding in Shelley has been confined to the race-discrimination context. Although many courts have been presented with the argument that Shelley should be construed more broadly, they have not signed on, including in the context of courts' enforcing arbitration awards and private contracts. See Davis, 59 F.3d 1186 at 1191 (stating that defendant was asserting a "Shelley v. Kramer theory that a court's enforcement of a private contract constitutes state action," but finding that "[t]he holding of Shelley . . . has not been extended beyond the context of race discrimination"); Ohno v. Yasuma, 723 F.3d 984, 998

24

(9th Cir. 2013) (rejecting argument that recognizing a foreign judgment constitutes state action and holding that "Shelley's attribution of state action to judicial enforcement has generally been confined to the context of discrimination claims under the Equal Protection Clause"); United Egg, 44 F.3d at 943 (noting that judicial enforcement of private agreements does not constitute state action unless there is "finding that constitutionally impermissible discrimination is involved"). This Court agrees and thus declines to extend Shelley to the facts of this case.

As this Circuit has underscored, "If, for constitutional purposes, every private right were transformed into governmental action by the mere fact of court enforcement of it, the distinction between private and governmental action would be obliterated." Edwards v. Habib, 397 F.2d 687, 691 (D.C. Cir. 1968). Plaintiffs here ask the Court to engage in precisely such elision between the state-action requirement and court enforcement of an arbitral award. Rejecting such an outcome, the Court finds instead that in the arbitration context, "[government] permission of a private choice cannot support a finding of state action." Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 54 (1999).

### 3. *Public Policy and the First Amendment*

Finding no state action, the Court next considers Plaintiffs' argument that the emergency order is, nonetheless, contrary to public policy. On this point, the Court concludes that the First Amendment provides no "well defined and dominant" public policy in favor of permitting private parties to speak absent state action. Instead, the precedent is abundantly clear that the rights enshrined in the First Amendment cannot, and should not, be uncoupled from the state-action requirement.

At bottom, the First Amendment "is a restraint on government action, not that of private persons." Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm., 412 U.S. 94, 114 (1973).

This maxim is clear from the numerous cases upholding restrictions on speech in private contracts and arbitration agreements. Time and time again, courts have held that <u>because</u> there is no state-action present in the court's enforcement of such provisions, plaintiffs have no First Amendment claim. <u>See</u> <u>Bronner</u>, 249 F. Supp. 3d at 42 (stating that enforcement of plaintiffs' rights derived from contract limiting defendants' speech "would not constitute state action[,] . . . <u>meaning</u> that there would be no First Amendment issue with a judgment for plaintiffs in this case") (emphasis added); <u>Dominion Video Satellite, Inc. v. Echostar Satellite L.L.C.</u>, 430 F.3d 1269, 1276 (10th Cir. 2005) (rejecting argument that district court order confirming arbitration award was content-based restriction and unlawful prior restraint on speech because party "failed to provide relevant authority to satisfy its burden of demonstrating state action[,] a finding <u>required</u> to trigger application of the First Amendment") (emphasis added); <u>Roberts</u>, 2016 WL 1660049, at *2 (rejecting claim that arbitration would violate First Amendment petition clause and holding that "<u>in order</u> for Plaintiffs to have a First Amendment claim, they must first show state action") (emphasis added).

Plaintiffs are unable to demonstrate why this case is at all distinguishable from such precedent. Instead, this action boils down to a dispute over a private agreement – precisely the type of controversy that courts have held is not subject to the First Amendment. "Arbitration is a private self-help remedy," and "[w]hen arbitrators issue awards, they do so pursuant to the disputants' contract – in fact the award is a supplemental contract." <u>Smith v. American Arbitration Ass'n</u>, 233 F.3d 502, 507 (7th Cir. 2000). The emergency award in this case is the result of a private agreement between two willing, sophisticated parties. In entering into the arbitration agreement, Sharp subjected itself to the full range of restrictions articulated under the

SIAC rules, which were expressly incorporated into the licensing agreement. <u>See</u> Licensing Agreement.

The SIAC rules, for instance, provide that an emergency arbitrator "shall have the power to order or award <u>any</u> interim relief that he deems necessary," SIAC Rules, Schedule 1, ¶ 8. The Rules also contain a broad confidentiality provision, which states that "all matters relating to the proceedings and the Award" are confidential. <u>Id.</u> at Rule 39.1. In entering into the arbitration provision of the TLA, which expressly incorporated the SIAC rules, Sharp willingly subjected itself to precisely the type of interim award issued in this case. As discussed above, such a contract between private parties does not implicate the First Amendment.

### a. Analogous Caselaw

Despite such precedent, Sharp asks this Court to find that there is nonetheless a First Amendment concern in this case. Specifically, Plaintiffs argue that the public-policy defense under the New York Convention expands the scope of the Amendment to include a general policy in favor of free speech, even where there is no state action. This is a matter of first impression in this Circuit, and there is no precedent directly on point. There are, however, certain bodies of caselaw that are helpful in guiding the Court's determination as to the parameters of constitutionally derived public-policy claims.

First, although both sides agree that there is no case addressing whether enforcing an arbitration agreement can violate the public policy of the First Amendment in the absence of state action, <u>see</u> Response at 27, neither party addresses the fact that there <u>are</u> cases addressing an analogous argument with respect to the Due Process Clause. In <u>MedValUSA Health Programs, Inc. v. MemberWorks, Inc.</u>, 872 A.2d 423 (Conn. 2005), for example, the Supreme Court of Connecticut considered the argument that an arbitration award violated the public

policy against excessive punitive damages, a limitation based in the Due Process Clause. Recognizing that there was no state action at issue, the defendant nonetheless asserted that the award was unenforceable due to a broader public policy against such punitive damages. The court squarely rejected this claim. It first explained that the Due Process Clause "barred a <u>state</u> from imposing grossly excessive punitive damages," a principle that was "premised on the presence of state action." <u>Id.</u> at 663. The court thus found that although there was certainly a "public policy against the imposition of [such damages] by the state," the Due Process Clause could not provide a basis for finding a "public policy against the imposition of excessive punitive damages by a private actor, such as an arbitration panel." <u>Id.</u> To draw the contrary inference, the court held, would be to "render meaningless" the limitation of the Due Process Clause to state actors by "circumventing the state action requirement." <u>Id.</u> at 663 n.16 Such an outcome would "pave[] the way for constitutionalizing a wide variety of private conduct through public policy analysis." <u>Id.</u>; <u>see also</u> <u>Shahinian v. Cedars-Sinai Medical Center</u>, 194 Cal. App. 4th 987 (2011) (rejecting argument that arbitration award violated public policy against excessive punitive damages because "arbitration in this case . . . was not state action [but] was a private proceeding, arranged by contract, without legal compulsion . . . and [c]onsequently, the arbitration and award themselves were not governed or constrained by due process") (internal citations omitted).

Here, validating Plaintiffs' claims would achieve the same result. By finding that the First Amendment establishes a general public policy in favor of speech, the Court would be permitting private parties to make an end-run around the state-action doctrine. The holdings of <u>MedValUSA</u> and <u>Shahinian</u> thus support Defendants' assertion that the public-policy exception

to the New York Convention cannot be so broadly construed so as to swallow the state-action requirements of a First Amendment claim.

The second set of cases that is helpful in guiding the Court's decision today addresses circumstances in which private employees have asserted that the First Amendment supports a public policy against their termination for the exercise of free speech. Like Sharp, these employees were unable to demonstrate state action with respect to the alleged constitutional infringement. Yet, those plaintiffs nonetheless asserted that their discharge violated public policy – an argument that was repeatedly rebuffed by the courts. In <u>Grinzi v. San Diego Hospice Corp.</u>, 120 Cal. App. 4th 72 (2004), for instance, the plaintiff asserted that the First Amendment provided a public policy sufficient to sustain her tortious-discharge claim against a private employer. The court concluded otherwise, holding that the public policy of the First Amendment was circumscribed by "substantive limitations in [the] constitutional provision[]," including the state-action requirement. <u>Id.</u> at 81. The court in <u>Grinzi</u> therefore concluded that the "First Amendment prohibition against government intrusions into free speech fails to establish public policy forbidding free-speech-based terminations by private employers." <u>Id.</u> at 81.

Similarly, in <u>Barr v. Kelso-Burnett Co.</u>, 106 Ill. 2d 520 (1985), the Supreme Court of Illinois considered whether private employees could assert a First Amendment public-policy violation giving rise to a retaliatory-discharge cause of action. The plaintiffs "concede[d] that the constitutional and statutory provisions . . . are limitations only on the power of government," but contended "that these provisions are indicators of public policy and thus a violation of these provisions by anyone is a violation of public policy." <u>Id.</u> at 527. The court disagreed, holding that "the public policy clearly mandated by the provisions cited in plaintiffs' complaint," including the First Amendment, "is that the power of government should be limited in those

areas." Id. The "public policy that is mandated by [those] provisions," the Court concluded, "is that the power of government, not private individuals, be restricted." Id. at 528; see also Newman v. Legal Servs. Corp., 628 F. Supp. 535, 540 (D.D.C. 1986), disapproved of on other grounds by Hall v. Ford, 856 F.2d 255 (D.C. Cir. 1988) (finding employee's alleged violation of public policy on First Amendment grounds "not actionable," and holding: "There is one overriding problem with plaintiff's identification of the First Amendment as a clear mandate of public policy in this case: By its own terms, the First Amendment applies only to federal or state governmental actors. If [Defendant] is held not to be a state actor [,] . . . the First Amendment could not serve as a clear source of public policy."); Edmondson v. Shearer Lumber Prod., 139 Idaho 172, 177 (2003) ("The prevailing view among those courts addressing the issue in the private sector is that state or federal constitutional free speech cannot, in the absence of state action, be the basis of a public policy exception in wrongful discharge claims.").

These decisions stand for the proposition that, even when a plaintiff asserts a general public-policy argument, the First Amendment does not apply outside of state action. As is clear from these decisions, the government-action requirement is not some technicality with which plaintiffs can dispense by cloaking their claims in the guise of "public policy." It is, instead, a necessary and fundamental underpinning of the First Amendment.

b.  Foreign Judgments

Finally, the Court turns briefly to Plaintiffs' reliance upon a limited number of cases in which U.S. courts have refused to enforce foreign judgments because they were contrary to the public policy of the First Amendment. This line of decisions appears to be confined largely to a narrow area of law – libel judgments issued by foreign courts. As Sharp correctly notes, federal courts have found certain foreign judgments unenforceable in the United States, concluding that

such judgments are "repugnant" to the public policy of the First Amendment.  See Matusevitch v. Telnikoff, 877 F. Supp. 1, 4 (D.D.C. 1995) (finding foreign judgment unenforceable on public-policy grounds because it would be contrary to First and Fourteenth Amendments); Bachchan v. India Abroad Publ. Inc., 585 N.Y.S. 2d 661, 662 (N.Y. Sup. Ct. 1992) (refusing to recognize foreign judgment when "the public policy to which the foreign judgment is repugnant is embodied in the First Amendment to the United States Constitution").  While having some superficial allure, these cases offer no succor here.

As an initial matter, all of Sharp's cited cases involve judgments rendered by foreign courts – not arbitration awards issued by private arbitrators.  This distinction matters.  First, as Defendants point out, the enforcement of foreign judgments is governed not by the New York Convention, but instead by general notions of comity, see Yahoo!, Inc. v. La Ligue Contre Le Racisme et L'Antisemitisme, 169 F. Supp. 2d 1181, 1192 (N.D. Cal. 2001), rev'd on other grounds, 433 F.3d 1199 (9th Cir. 2006), and state statutes governing the uniform enforcement of money judgments.  See, e.g., Naoko Ohno v. Yuko Yasuma, 723 F.3d 984, 987 (9th Cir. 2013) (analyzing whether Japanese judgment was against public policy under California's Uniform Foreign-Country Money Judgments Recognition Act).

Second, the foreign-judgment cases make clear that the courts' concern is whether the underlying cause of action on which the judgment is based – typically a claim for libel – would be consonant with the First Amendment if asserted in the United States.  See, e.g., Bachchan, 585 N.Y.S. 2d at 662.  Here, the "cause of action" that led to the judgment against Sharp is an action pursuant to an arbitration award entered under a private agreement between private parties.  The fact that the emergency order was, in this case, issued by a foreign arbitrator makes no difference.  The First Amendment would be no more offended by the parties' arbitration

agreement and the resulting award if such proceedings occurred across the street. The foreign-judgment cases cited by Plaintiffs are thus distinguishable from the facts of this case, as they are concerned with whether a foreign court has entertained a cause of action that would not be cognizable if brought in this country. Cf. Yahoo! Inc., 169 F. Supp 2d at 1192 (finding that foreign judgment "clearly would be inconsistent with the First Amendment if mandated by a court in the United States"). The SIAC arbitrator, by contrast, issued an order that the precedent shows would be permissible and enforceable, even if made by a U.S. arbitral body.

Finally, it is reasonable that U.S. courts may be more concerned with the First Amendment implications of foreign judgments than foreign arbitral awards. The former come far closer to the state-action concerns of the First Amendment than do the latter, as they involve the coercive power of a state over potentially non-consenting parties. Arbitration, by contrast, simply involves the bargained-for results of the parties' mutual agreement to forgo the judicial system. Although it is not explicit in the reasoning of the foreign libel decisions, the Court finds persuasive this distinction between the level of state action involved in foreign judgments versus foreign arbitration. See Montré D. Carodine, Political Judging: When Due Process Goes International, 48 Wm. & Mary L. Rev. 1159, 1242 (2007) ("Foreign judgments are readily distinguishable from private contractual rights. . . . [P]arties freely and voluntarily enter into private contracts. A foreign judgment is usually obtained after litigation . . . [and] under most circumstances, the [defendant] can hardly be said to have voluntarily agreed to the terms of the foreign judgment.").

Indeed, unlike foreign judgments, arbitration proceedings and awards are "simply a matter of contract between the parties." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995). The determinations of an arbitral body are a reflection of that bargained-for

arrangement and involve no independent governmental acts. Here, no law compelled Sharp and Hisense to submit to arbitration. The two parties entered into the arbitration provision of the TLA willingly, and no state action was involved in the proceedings or entry of the interim award. The Court therefore finds the foreign-judgment decisions inapposite, in part because they reflect a degree of governmental involvement not present in this case.

Put simply, there is no free-floating, penumbral public policy protecting free speech. The principle underlying the First Amendment – that citizens shall be free from government acts infringing upon their rights of expression and petition – is inherently tied to the state-action requirement. Because Sharp can make no showing of such government involvement, and because all of its counts rely upon the alleged violations of First Amendment policies, the Court will grant Defendants' Motion to Dismiss.

D.     Discretion Under Declaratory Judgment Act

In addition to the lack of personal jurisdiction and Plaintiffs' failure to state a claim, there is yet another reason why Sharp comes up empty. Given the ongoing arbitration proceedings in this case, the Court is unconvinced that a declaratory judgment is the appropriate relief at this time. As has long been held, the Declaratory Judgment Act gives courts discretion to determine "whether and when to entertain an action." Wilton v. Seven Falls, 515 U.S. 277, 282 (1995); see MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 136 (2007) (Declaratory Judgment Act "has long been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights of litigants") (internal quotation marks omitted); Pub. Affairs Assocs. v. Rickover, 369 U.S. 111, 112, (1962) ("The Declaratory Judgment Act was an authorization, not a command."). This determination is guided by the court's sense of "practicality and wise judicial administration," Wilton, 515 U.S. at 287-88, as well as numerous

other factors.  <u>See</u> <u>Hanes Corp. v. Millard</u>, 531 F.2d 585, 591 n.4 (D.C. Cir. 1976), <u>overruled on other grounds by</u> <u>Nat'l R.R. Passenger Corp. v. Consol. Rail Corp.</u>, 892 F.2d 1066, 1072 (D.C. Cir. 1990) (listing as among factors whether it would finally settle controversy between parties, whether other remedies are available or other proceedings pending, convenience of parties, equity of conduct of declaratory-judgment plaintiff, prevention of procedural fencing, state of record, degree of adverseness between parties, and public importance of question to be decided).

As Defendants note and Plaintiffs concede, there is currently a motion to vacate the emergency order pending before a full arbitral panel of the SIAC.  <u>See</u> Exh. E.  There will be a hearing on this motion next month, with a decision expected two months later.  <u>See</u> Omnibus Response at 40; ECF No. 35-3 (Declaration of Woo Shu Yan), ¶¶ 9-10.  This pending motion weighs in favor of declining to issue a declaratory judgment and, at the very least, staying the case.

The New York Convention expressly provides that a court may impose a stay when a petition to vacate is pending before a court in the country of primary jurisdiction.  <u>See</u> Convention, art. VI.  This discretion, coupled with the Court's inherent leeway in deciding whether to exercise its jurisdiction under the Declaratory Judgement Act, counsel against interference in an ongoing international-arbitration dispute.  <u>See</u> <u>Telcordia Techs., Inc. v. Telkom SA, Ltd.</u>, 95 F. App'x. 361, 362–63 (D.C. Cir. 2004) (affirming district court decision to adjourn case pursuant to New York Convention, where foreign set-aside proceeding was underway); <u>In Re Arb. of Certain Controversies Between Getma Int'l & Republic of Guinea</u>, 142 F. Supp. 3d 110, 116–17 (D.D.C. 2015) (granting stay of arbitration-award action pending resolution of foreign proceeding seeking annulment of award and noting possibility that award will be set aside favors granting stay).  As was articulated in this Circuit's decision in <u>Hanes</u>, the

34

"propriety of granting a declaratory judgment" is informed, in part, by the question of whether "other remedies are available or other proceedings pending." 531 F.2d at 591 n.4. Here, such proceedings are already well underway. Foreign proceedings to vacate the emergency award were initiated prior to the instant suit, see Exh. E, and the SIAC is only months away from taking action on the merits of Plaintiffs' claims.

The Court therefore finds that practical considerations counsel it to refrain from exercising its authority to issue a declaratory judgment. Even in a world in which the merits of this case were not so readily resolved in Defendants' favor, Plaintiffs would nonetheless not prevail.

## IV.    Conclusion

Although Plaintiffs certainly feel aggrieved by the emergency order imposed upon them by the SIAC, they have no legal recourse in this Court. There is no personal jurisdiction over Defendants in the District, and, even if there were, the emergency order does not violate a fundamental public policy. And, assuming *arguendo* that the Court reached neither of those conclusions, it would nonetheless decline to exercise its authority under the Declaratory Judgment Act in light of the pending motion to vacate before the SIAC. For all of these reasons, the Court will grant Defendants' Motion to Dismiss. A separate Order consistent with this Memorandum Opinion shall issue on this date.


Date:  November 13, 2017

                                             /s/ James E. Boasberg
                                             JAMES E. BOASBERG
                                             United States District Judge